UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ROCKFISH, INC., | CASE NO. C22-1659JLR |
| Plaintiff, | ORDER |
| v. | |
| UNIDENTIFIED WRECKED AND ABANDONED VESSEL, | |
| Defendant. | |

**I.     INTROCUTION**

Before the court is Claimants London Market Insurers Resolute Management Ltd., Mercantile Indemnity Company Limited, and Royal Exchange Assurance PLC's (collectively, "LMI Claimants") motion to dismiss this action for lack of subject matter jurisdiction, to vacate a settlement agreement with Plaintiff Rockfish, Inc. ("Rockfish"), and for attorneys' fees.  (MTD (Dkt. # 98); Reply (Dkt. # 112); *see also* Settlement Stip. (Dkt. # 79); 1/26/24 Order (Dkt. # 80) (incorporating settlement agreement).)  Claimant

ORDER - 1

Donald W. Foster joins LMI Claimants' motion (Joinder Not. (Dkt. # 103)), and Rockfish opposes the motion (Resp. (Dkt. # 107).) The court has reviewed the submissions, the relevant portions of the record, and the applicable law. Being fully advised,[1] the court DENIES LMI Claimants' motion.

## II.   BACKGROUND

The S.S. PACIFIC was a wooden side-wheel steamer that was built in 1850. (Am. Compl. (Dkt. # 54) ¶ 3.1.) She departed Victoria, B.C. for San Francisco in 1875 with a cargo that included gold and specie. (*Id.* ¶ 3.2; LMI Claimants Statement (Dkt. # 29) ¶ 2.) On November 4, 1875, as she steamed along the Washington coast, she collided with the sailing vessel ORPHEUS off Cape Flattery and sank. (Am. Compl. ¶¶ 2.1, 3.2.) An estimated 236-300 individuals on board the S.S. PACIFIC perished in the disaster. (Westrick Decl. (Dkt. ## 5 (sealed), 11 (redacted)) at 3.)

Over a century later, Rockfish sought to locate and salvage the S.S. PACIFIC. (*See* Am. Compl. ¶ 3.3.) In 2021, it located a target about 20 miles off the Pacific Coast of Washington that it believed was likely the S.S. PACIFIC, and in 2022 it performed sonar surveys that revealed a debris field and the wreck of a vessel with characteristics, timber arrangements, and dimensions matching the configuration of the S.S. PACIFIC. (*Id.* ¶¶ 3.5, 3.8.) The surveys also revealed "two circular objects approximately 8 meters

---

[1] Neither LMI Claimants, Rockfish, nor Mr. Foster requests oral argument (*see* Mot. at 1; Resp. at 1; Joinder Not. at 1), and the court concludes that oral argument is not necessary to decide the motion. *See* Local Rules W.D. Wash. LCR 7(b)(4).

in diameter, consistent with the dimensions . . . of the S.S. PACIFIC's paddle wheels." (*Id.*)

In September and November 2022, Rockfish deployed a remotely operated vehicle ("ROV") to the site, recorded video of the wreck, and recovered artifacts including a fire brick and pieces of wood. (*Id.* ¶ 3.6.) Rockfish came to believe that the wrecked vessel was the S.S. PACIFIC, and it based this belief upon "the location of the wreck site, dimensions of the wreck, presence of a pair of eight meter circular objects in the debris field consistent with the dimensions of the S.S. PACIFIC's paddle wheels, and presence of coal in the debris field[.]" (*Id.* ¶ 3.7.)

On November 21, 2022, Rockfish initiated this lawsuit under the court's admiralty jurisdiction and sought, among other things, a maritime lien, a salvage award, and an injunction granting Rockfish exclusive salvage rights to the vessel and preventing competing salvage operations. (*See* Compl. (Dkt. # 1) ¶¶ 4.1-4.5, 6.1-6.4.) The complaint named "Unidentified Wrecked and Abandoned Vessel" as the Defendant and described the vessel as a "wrecked and abandoned 19th century steamship believed to be the wreck of the S.S. PACIFIC." (*Id.* ¶ 2.2.) That same day, Rockfish supported its complaint with the declaration of Robert Westrick, a marine archeologist.[2] (Westrick Decl. at 1.) In relevant part, Mr. Westrick stated that the sonar imaging obtained by

---

[2] In October 2024, nearly two years after Rockfish filed this declaration, Mr. Westrick submitted a letter under seal raising questions about the legitimacy of the declaration. (Westrick Letter (Dkt. # 92 (sealed)).) After reviewing the relevant evidence and argument, the court concluded that the declaration was legitimate and that "the evidence shows that neither Rockfish nor its counsel engaged in any misconduct in preparing or filing" the declaration. (12/19/24 Order (Dkt. # 114) at 3-4.)

ORDER - 3

Rockfish was consistent with data one would expect to observe from the wreckage of the S.S. PACIFIC. (*Id.* at 2.) He stated that a high-resolution image obtained by Rockfish showed that "[t]he size and shape of the hull match what one would expect to find from the known dimensions of the S.S. PACIFIC." (*Id.* at 3.) As to the recovered fire brick, Mr. Westrick stated that, "[a]lthough the maker has yet to be identified and research is ongoing," the brick was "typical" for bricks from the era of the S.S. PACIFIC. (*Id.* at 4.)

On November 23, 2022, after reviewing Rockfish's verified complaint, the court issued a warrant arresting the artifacts that Rockfish had recovered from the vessel and instructing the U.S. Marshal to arrest and take constructive possession of the vessel. (Arrest Warrant (Dkt. # 7-1) at 1-2.) The court also entered an order granting Rockfish the exclusive right to salvage the vessel within designated coordinates for 12 months, and requiring Rockfish to submit a salvage plan, promptly advise the court if it recovers any additional artifacts, and submit status reports every 90 days describing the status of its salvage operations. (11/23/22 Order (Dkt. # 7) at 3-5.)

On January 9, 2023, Claimant Donald W. Foster submitted a statement of interest in the cargo of the S.S. PACIFIC. (Foster Statement (Dkt. # 23).) Mr. Foster claimed that his great-great grandfather perished when the S.S. PACIFIC sank, and that he therefore had an interest through inheritance to the personal property, including gold, that his great-great grandfather was carrying at the time. (*Id.* at 1-2.)

On February 6, 2023, LMI Claimants submitted a statement of interest, which they amended on April 13, 2023, claiming in relevant part that they own certain gold and specie cargo on board the S.S. PACIFIC because their predecessors-in-interest insured a

portion of the cargo and indemnified and paid for the loss of that cargo after the S.S. PACIFIC sank. (LMI Claimants Am. Statement (Dkt. # 59) at 2-3; *see also* LMI Claimants Statement at 2-3.)

On March 6, 2023, Rockfish filed a salvage plan that projected a four-year effort to investigate, excavate, and recover the S.S. PACIFIC in five phases, starting with examining and documenting the site and conducting a pre-disturbance survey, and ending with recovering the main steam engine, paddle wheel, and boiler. (Salvage Plan (Dkt. ## 47-1 (redacted), 48 (sealed)) at 8.) On March 30, 2023, Rockfish amended its complaint, adding allegations concerning its ownership interests in the S.S. PACIFIC and in certain of her cargo and freight. (Am. Compl. ¶¶ 3.12-3.19.) As amended, Rockfish's complaint sought four remedies: (1) a maritime lien and salvage award; (2) alternatively, full possession under the law of finds; (3) exclusive salvor rights and an injunction against competing salvage operations; and (4) a declaratory judgment concerning Rockfish's ownership interests in the S.S. PACIFIC and certain of her cargo and freight. (*Id.* ¶¶ 4.1-7.3.) Rockfish's amended complaint continued to name, as the Defendant, "Unidentified Wrecked and Abandoned Vessel . . . believed to be the wreck of the S.S. PACIFIC." (*Id.* ¶ 2.2.)

On April 20, 2023, the court entered a scheduling order setting a bench trial for April 21, 2025. (4/20/23 Min. Order (Dkt. # 62).) A few months later, Rockfish and LMI Claimants jointly requested to participate in a settlement conference. (Stip. Mot. (Dkt. # 70).) The court granted the request (9/27/23 Order (Dkt. # 71)), and United States

Magistrate Judge Michelle L. Peterson conducted a settlement conference on November 9, 2023 (Min. Entry (Dkt. # 73)).

On October 27, 2023, Rockfish conducted an expedition to the wreck site, performed a detailed sonar survey of the surrounding area, and deployed an ROV that "dove to within 30 meters of the wreck, and then maneuvered to view the lower section of the hull and the starboard aft section." (11/16/23 Status Report (Dkt. # 74) at 1-2.) Rockfish reported to the court that its team was able to "visually confirm . . . wreck characteristics noted in side scan sonar imaging[.]"[3] (*Id.* at 2.)

On December 22, 2023, the court entered a preliminary injunction granting Rockfish the exclusive right to salvage "the Defendant Unidentified Wrecked and Abandoned Vessel" and enjoining all other salvors from engaging in salvage operations within certain coordinates. (12/22/23 Order (Dkt. # 78) at 1-2.) The order stated that Rockfish's exclusive salvage right would lapse on April 21, 2025, but Rockfish could seek an extension if it demonstrated that "its salvage efforts will be undertaken with due diligence, are ongoing, and [are] clothed with some prospect of success[.]" (*Id.* at 2.)

On January 25, 2024, Rockfish and LMI Claimants filed a stipulation informing the court that they had reached agreement during the settlement conference, and they attached a proposed order that included the material terms of the settlement. (*See* Settlement Stip.) The next day, the court signed the proposed order to incorporate the

---

[3] On November 30, 2023, Jeffrey Hummel, Rockfish's President and Chairman of the Board, confirmed that he reviewed and approved the status reports filed by Rockfish and confirmed that "these reports contain an accurate and truthful discussion of Rockfish's . . . salvage-related activities." (11/30/23 Hummel Decl. (Dkt. # 76) at 1.)

material terms of the settlement agreement. (1/26/24 Order.) In relevant part, the settlement recited and provided as follows:

> [T]his [c]ourt . . . FINDS:
>
> * * *
>
> H. Rockfish located the [S.S.] PACIFIC submerged in the Pacific Ocean. To date, no gold cargo or specie has been identified or salvaged from the wreckage of the [S.S] PACIFIC.
>
> * * *
>
> K. Rockfish and LMI participated in a Judicial Settlement Conference with Magistrate Judge Michelle Peterson on November 9, 2023, and reached a settlement of their respective claims . . . .
>
> L. This [c]ourt has incorporated the material terms of the Rockfish and LMI [Claimants] settlement as a final adjudication of their claims . . . the exact amount of the salvage award against the Insured Cargo to which Rockfish shall be entitled, and the disposition of the Insured Cargo.
>
> IT IS THEREFORE ORDERED AND ADJUDGED AS FOLLOWS:
>
> THAT as used herein, the term "Gold Cargo" shall mean gold cargo in any form, including gold bullion, gold dust, gold bars, and specie cargo, specifically including the Insured Cargo, carried about the [S.S.] PACIFIC on November 4, 1875. The term Gold Cargo does not include personal effects of passengers or crew . . . .
>
> THAT LMI [Claimants] shall have a 1.598% ownership in all Gold Cargo in any form . . . .
>
> * * *
>
> THAT any and all Gold Cargo recovered from the wreck of the [S.S.] PACIFIC shall be sold by an international auction house or numismatic expert mutually agreed in writing by LMI [Claimants] and Rockfish.
>
> * * *

1    THAT after satisfaction of the international auction house or numismatic experts['] commission, LMI [Claimants are] entitled to 1.598% of the remining auction net sale proceeds from . . . the Gold Cargo.  This allocation reflects [LMI Claimants'] ownership interest in the Insured Cargo less an agreed and stipulated salvage award for Rockfish.  Rockfish is entitled to the remaining 98.402% of auction net proceeds, unless claimants other than LMI [Claimants] successfully establish a right of possession or ownership interest in the Gold Cargo, in which case the remining 98.402% of any auction net proceeds shall be paid to Rockfish and such claimants on a pro-rata basis.

THAT if the Rockfish salvage operation for the Gold Cargo is unsuccessful by November 9, 2033, LMI [Claimants] shall have no further obligation to Rockfish, and LMI [Claimants] shall be entitled to retain the salvor of their choice to search for and salvage the Insured Cargo carried abord the [S.S.] PACIFIC.

(*Id.* at 3-5.)

On March 22, 2024, Rockfish filed an unopposed motion to expand the geographic scope of the court's preliminary injunction, arguing that new surveys gave it "reason to believe valuable artifacts associated with the [v]essel lie in th[e] new region."  (Mot. to Expand Injunction (Dkt. # 82) at 2.)  A few days later, the court granted the motion and expanded the geographic scope of the preliminary injunction as Rockfish had requested. (3/25/24 Order (Dkt. # 85).)

### III.  ANALYSIS

The court first discusses the applicable legal standards.  It then addresses the two alternative arguments in LMI Claimants' motion to dismiss:  (1) that the court should dismiss this action for lack of subject matter jurisdiction, and (2) that the court should vacate the settlement agreement between LMI Claimants and Rockfish.[4]

---

[4] The court does not address any separate argument in Mr. Foster's notice of joinder because "[a] notice of joinder is not the proper mechanism in which to raise distinct substantive

A.    **Legal Standards**

The court has a continuing and independent obligation to determine whether subject matter jurisdiction exists. *Clark v. City of Seattle*, 899 F.3d 802, 808 (9th Cir. 2018). A party cannot waive subject matter jurisdiction, and "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

A movant may attack subject matter jurisdiction either facially or factually. *Edison v. United States*, 822 F.3d 510, 517 (9th Cir. 2016). In a facial attack, the movant asserts that the allegations in a complaint do not on their face invoke federal jurisdiction. *Id.* "By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). After a factual attack, Plaintiffs must present "affidavits or any other evidence necessary to satisfy [their] burden of establishing that the court . . . possesses subject matter jurisdiction." *Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1121 (9th Cir. 2009 (cleaned up)). And the court "may look beyond the pleadings to the parties' evidence without converting the

---

arguments." *See Wineland v. Air & Liquid Sys. Corp.*, C19-0793RSL, 2020 WL 5893409, at *3 (W.D. Wash. Oct. 5, 2020). The court also does not analyze in detail LMI Claimants' premature argument that, because Rockfish has not successfully salvaged the vessel, it cannot succeed on the merits of its claims. (*See* MTD 9-10.) The court agrees that Rockfish will need to prove success before it can claim any salvage award, *see Anderson v. Edam*, 13 F. 135, 138 (E.D.N.Y. 1882), but that does not mean that Rockfish must prove its success *now*. The court awarded Rockfish exclusive salvage rights until April 21, 2025 and permitted Rockfish to seek an extension if it shows that "its salvage efforts will be undertaken with due diligence, are ongoing, and clothed with some prospect of success[.]" (12/22/23 Order at 2.) Thus, Rockfish still has time to salvage the wreck or move for an extension.

motion to dismiss into one for summary judgment." *Edison*, 822 F.3d at 517; *see also Mecinas v. Hobbs*, 30 F.4th 890, 896 (9th Cir. 2022) (noting that, when a moving party makes a factual challenge to subject matter jurisdiction by presenting evidence, "the court may resolve any factual disputes concerning the existence of jurisdiction").

However, "when jurisdictional issues are intertwined with an element of the merits of the plaintiff's claim, the court must treat the motion like a motion for summary judgment and leave the resolution of material factual disputes to the trier of fact." *Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134, 1143 (9th Cir. 2024) (cleaned up); *Mecinas*, 30 F.4th at 896 (same); *see also Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983) (noting that, "where the jurisdictional issue and substantive issues are so intertwined" that jurisdiction depends on resolving factual issues going to the merits, "the jurisdictional determination should await a determination of the relevant facts on either a motion going to the merits or at trial").

**B.    Subject Matter Jurisdiction**

District courts have original jurisdiction, exclusive of state courts, over any civil case of admiralty or maritime jurisdiction.  28 U.S.C. § 1331.  "Claims arising out of salvage operations at sea beyond the territorial limits of the United States are within the admiralty jurisdiction of the federal courts." *MDM Salvage, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel*, 631 F. Supp. 308, 311 (S.D. Fla. 1986) (citing *Treasure Salvors Inc. v. The Unidentified, Wrecked, and Abandoned Sailing Vessel*, 640 F.2d 560 (5th Cir. 1981)).

An *in rem* action to enforce a claim for a salvage award "depends on the court's having jurisdiction over the *res*[.]" *R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 964 (4th Cir. 1999).  The *res*—the ship or cargo—must be within the court's possession by being within either the district in which the complaint is filed, or the court's constructive possession.  *Id.*; *see also California v. Deep Sea Rsch., Inc.*, 523 U.S. 491, 496 (1998) (affirming portion of judgment assuming jurisdiction when district court had possession of "several artifacts" from the shipwreck "including china, a full bottle of champagne, and a brass spike").  By way of example, a court has asserted jurisdiction when a plaintiff conducted viable salvage operations and retrieved two mosaic friezes from a shipwreck, and when it was "reasonably likely that plaintiff's salvage operations will yield other portions of the shipwreck[.]" *Moyer v. Wrecked and Abandoned Vessel*, 836 F. Supp. 1099, 1104 (D.N.J. 1993).  Another court retained jurisdiction after a salvor tendered "several important artifacts from the site, including one rock, one brick, one piece of pottery[,] and one brass pin" that came from one or more vessels.  *Fathom Exploration, LLC v. Unidentified Shipwrecked Vessel or Vessels*, 352 F. Supp. 2d 1218, 1220, 1224 (S.D. Ala. 2005).  In general, "salvage law encourages salvors to undertake risks to rescue imperiled maritime property . . . .  The expenditures required to establish constructive possession and ongoing salvage operations for sunken ships [are] justified by the prospect of . . . exclusive salvage rights and a liberal award from any salvaged property." *Yukon Recovery, L.L.C., v. Certain Abandoned Prop.*, 205 F.3d 1189, 1196 (9th Cir. 2000).  Thus, a party need not "positively identify the wreckage" before

1 | bringing an action to secure and maintain exclusive salvage rights on a shipwreck.

2 | *Fathom Exploration*, 352 F. Supp. 2d at 1224.

3 |     LMI Claimants present a factual jurisdictional attack, arguing that Rockfish cannot

4 | confirm that it has "definitely located" the S.S. PACIFIC or that the artifacts it has

5 | recovered belong to that vessel. (MTD at 11; *see* Reply at 7.) In support, LMI Claimants

6 | filed the declaration of Matthew McCauley, who states that he previously worked with

7 | Rockfish and Mr. Hummel. (McCauley Decl. (Dkt. # 99) at 1-2.) Mr. McCauley avers

8 | that he "learned from Jeffrey Hummel and Sarah Haberstroh, a shareholder of Rockfish []

9 | and trained ROV operator, that the formations in the ocean floor believed to be

10 | paddlewheels from the S.S. PACIFIC were not paddlewheels at all, but were wire crab

11 | pots." (*Id.* at 3.) Mr. McCauley also states that Mr. Hummel partnered with Ocean

12 | Infinity to use its crew and vessel to visit the wreck site from March 5, 2024 to April 9,

13 | 2024, but that the expedition "ended in a disaster because no relics were obtained and the

14 | wreckage of the S.S. PACIFIC was not located." (*Id.* at 3-4.) Mr. McCauley has not

15 | reviewed video footage from the expedition but has reviewed production notes created by

16 | an independent videographer who had joined on the expedition. (*Id.* at 4.) From these

17 | notes, and from conversations he had with Mr. Hummel, Ms. Haberstroh, and another

18 | Rockfish shareholder, Mr. McCauley believes that Rockfish has not located the S.S.

19 | Pacific. (*Id.*)

20 |     In response, Rockfish submits a declaration from Mr. Hummel stating that

21 | magnetometer data from the March 2024 expedition supported that "something with a

22 | substantial magnetic signature is down there, and it is unlikely to be a mere geologic

1   feature." (12/9/24 Hummel Decl. (Dkt. # 109) at 2-3.)[5] Mr. Hummel also states that
2   other evidence supports that there is a wreck at the site and is consistent with his view
3   that the wreck is the S.S. PACIFIC, including the following: (1) excavation at the
4   suspected paddlewheel site yielded a large encrusted iron object, which is consistent with
5   fasteners that would have been used to secure heavier planking or other timber
6   arrangements present in some areas of the S.S. PACIFIC's hull; (2) an electron dispersive
7   spectroscopy on sediment samples revealed minerals that were not naturally occurring at
8   the site, with a composition "suggest[ing] they originated in British Columbia, where the
9   last voyage of the S.S. PACIFIC originated"; (3) a scan with sonar equipment of the
10  "entire probability area" for the final resting place of the S.S. PACIFIC did not reveal any
11  other possible wreck sites, other than modern wrecks; (4) the presence of a "very large
12  debris field extending from the wreck site" is consistent with evidence that the S.S.
13  PACIFIC suffered an explosion from one of her boilers after the collision; and (5) other
14  characteristics of the wreck site suggest the presence of a wreck, including marine life
15  known to inhabit wrecks, and sonar imagery revealing an object consistent with the
16  dimensions of the S.S. PACIFIC. (*Id.* at 3-5.)
17        In addition to Mr. Hummel's declaration, the record also contains ample other
18  evidence that Rockfish has located a wrecked vessel, including images of the wreck
19  itself, the recovered artifacts, and sonar imaging. (*See* Westrick Decl. at 1-4.)

---

[5] Mr. Hummel disputes the inferences that LMI Claimants attempt to draw from the unsuccessful March 2024 expedition, stating that the contractors there performed only one pass over the wreck site instead of multiple times as intended and improperly operated certain equipment. (*See* 12/9/24 Hummel Decl. at 2-5.)

ORDER - 13

1 Furthermore, Mr. Hummel verified the allegations in Rockfish's amended complaint and
2 declared that they were true and correct, including the allegations that Rockfish located
3 the wreck site and conducted surveys "reveal[ing] a debris field and the wreck of a vessel
4 approximately 70 meters in length, with distinctive characteristics, timber arrangements
5 and dimensions matching the configuration of the S.S. PACIFIC." (Am. Compl. ¶¶ 3.5,
6 3.7-3.8; Verification (Dkt. # 54-1) at 1-2.)

7  Accordingly, the court agrees with Rockfish that LMI Claimants' factual
8 challenge "is entirely focused upon factual issues that go to the merits." (Resp. at 7.) To
9 prevail on its maritime salvage claim, Rockfish must prove three elements: (1) a marine
10 peril to the property; (2) service voluntarily rendered when not required by an existing
11 duty or a special contract; and (3) success in whole or in part, or that the service rendered
12 contributed to such success. *Girard v. M/V Blacksheep*, 840 F.3d 1351, 1354 (11th Cir.
13 2016) (citing *The Sabine*, 101 U.S. 384, 384 (1879)); *McNabb v. O.S. Bowfin*, 565 F.
14 Supp. 22, 23 (W.D. Wash. 1983) (same). Once it proves its claim, the court then
15 considers evidence of several factors in calculating a salvage award, including the
16 following: (1) the time and labor expended by the salvors; (2) the promptitude, skill, and
17 energy displayed in saving the property; (3) the risk incurred by the salvors in securing
18 the property; (4) the value of the property saved; (5) the degree of danger from which the
19 property was rescued; and (6) the value of the property employed by the salvors and the
20 danger to which the property was exposed. *See Saint Paul Marine Transp. Corp. v.*
21 *Cerro Sales Corp.*, 505 F.2d 1115, 1120 (9th Cir. 1974) (citing *The Blackwall*, 77 U.S. 1,
22 13-14 (1869)).

LMI Claimants' factual questions concerning the property that Rockfish has found and rescued, if any, are entangled in the merits of Rockfish's claim. Although Rockfish does not need to identify the wreck at the site to show that the court has jurisdiction, Rockfish must show that there is a wreck both to support constructive jurisdiction and to show, after successful efforts, that it should receive an award for salvage. The court concludes that the jurisdictional issues raised by LMI Claimants concern genuine, material disputes of fact that are intertwined with the merits of Rockfish's claims. These must await trial.

**C.   Settlement Agreement**

LMI Claimants also argue that the court should set aside their settlement agreement with Rockfish because LMI Claimants settled their claims after relying upon Rockfish's allegedly-fraudulent representations that it had located the S.S. PACIFIC and all that remained was to dive on, excavate the wreck site, and salvage the cargo. (MTD at 12.) In support, LMI Claimants point to (1) statements in Rockfish's verified complaint that Rockfish "believed" that the Defendant vessel was the wreck of the S.S. PACIFIC; (2) statements in a sworn declaration that Rockfish had "located the wreck of the [v]essel, along with the associated debris field"; and (3) a recital in the settlement stipulation. (*See* Reply at 2-3.) This recital reads as follows: "Rockfish located the [S.S.] PACIFIC submerged in the Pacific Ocean. To date, no gold cargo or specie has been identified or salvaged from the wreckage of the [S.S.] PACIFIC." (1/26/24 Order at 3.)

Rockfish responds that LMI Claimants understood before settling their claims that Rockfish had not yet conclusively identified the vessel as the S.S. PACIFIC. (Resp. at

12-13.) Rockfish also points out that, nine months before settling the case, LMI Claimants signed a joint status report acknowledging their understanding that Rockfish had not yet confirmed that the vessel was the S.S. PACIFIC. (*See* Resp. at 12; 3/15/23 JSR (Dkt. # 50) at 3 ("[LMI] Claimants assert that discovery is premature and should be stayed until such time as (i) the [v]essel is confirmed to be the S.S. PACIFIC; and (ii) [Rockfish] recovers, locates, or identifies gold or any other property abord the S.S. PACIFIC[.]").)

"A court may set aside a settlement agreement induced by fraud." *In re Deepwater Horizon*, 786 F.3d 344 (5th Cir. 2015). To show fraudulent inducement, a party seeking to set aside or rescind a settlement agreement must prove the following six elements:

> (1) a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the representation was made with the intention that it be acted upon by the other party; (5) the party acted in reliance [] upon the representation; and (6) the party suffered injury.

*Id.* (citation omitted).[6]

LMI Claimants fail to make this showing for several reasons. First, they have not shown any false statement or resulting injury. LMI Claimants cite Mr. McCauley's declaration to cast doubt on Rockfish's belief that it has located the S.S. PACIFIC, including statements by Mr. McCauley that a Rockfish shareholder told him that the

---

[6] The elements under Washington State law to rescind a contract based upon fraud are materially similar. *See, e.g.*, *State v. Hardesty*, 915 P.2d 1080, 1088 (Wash. 1996).

formations on the ocean floor previously believed to be paddlewheels turned out to be unrelated wire crab pots. (MTD at 6 (citing McCauley Decl. ¶¶ 9-10).) Thus, LMI Claimants assume that Rockfish has not "located any vessel[,]" and that Rockfish's statements that it has located a vessel and that the vessel is the S.S. PACIFIC are both false. (Reply at 2 (emphasis omitted)). However, this assumption ignores the ample evidence provided by Rockfish that it has located a vessel in the Pacific Ocean that could be the S.S. PACIFIC, including images and expert opinion. Even if some of Rockfish's beliefs about the wreck site turned out to be incorrect, Rockfish may still definitively show that it has located the S.S. PACIFIC. If that happens, the recital in the settlement that Rockfish located the S.S. PACIFIC would be true, and in any event LMI Claimants would not have suffered any injury.

Second, even if Rockfish's statement is false, LMI Claimants have not shown that Rockfish knew it was making a false statement (or that it made the statement recklessly, without knowledge of its truth) when Rockfish and LMI Claimants settled. Rockfish has consistently maintained, and continues to maintain today, that it believes it has discovered the S.S. PACIFIC. Furthermore, the settlement occurred on November 9, 2023, and any information that Rockfish might have learned after that date—including anything learned during the unsuccessful March 2024 expedition to the wreck site—does not show what Rockfish knew when it settled with LMI Claimants. Likewise, in his declaration, Mr. McCauley does not specify when he spoke with Mr. Hummel or Rockfish's shareholders, and the only relevant dates in his declaration concern either the March 2024 expedition or later events. (*See* McCauley Decl. ¶¶ 10-18.)

Third, even if Rockfish's statement is false, LMI Claimants have not shown that they acted in reliance upon this statement. The settlement recites that Rockfish located the S.S. PACIFIC, but Rockfish's other statements before settlement clarify that Rockfish simply *believed* that it had located the S.S. PACIFIC and that circumstantial evidence supported Rockfish's belief. For instance, when Rockfish amended its complaint earlier in 2023, it continued to name an unidentified vessel "believed to be the wreck of the S.S. PACIFIC" as Defendant. (Am. Compl. ¶ 2.2.) Likewise, in a joint status report filed around the same time, LMI Claimants noted their understanding that Rockfish had not identified the wrecked vessel. (*See* 3/15/23 JSR at 3.) Thus, LMI Claimants knew in 2023 that Rockfish believed it had located the S.S. PACIFIC but had not definitively identified the vessel, and they point to no specific statements by Rockfish during settlement discussions that this situation had changed or that Rockfish had obtained a conclusive identification. In this context, without more, LMI Claimants fail to meet their burden to show that they relied upon Rockfish's statement in the settlement recitals.[7]

Accordingly, LMI Claimants fail to show that the court should vacate its order incorporating their settlement agreement with Rockfish or that the court should otherwise set aside or rescind their settlement on grounds of fraud. Accordingly, the court denies their request to set aside the settlement agreement.

---

[7] LMI Claimants do not request a hearing on their request to rescind the settlement agreement or represent that they have any additional evidence to present to the court. (*See generally* MTD; Reply.)

## IV. CONCLUSION

For the foregoing reasons, the court DENIES LMI Claimants' motion to dismiss and DENIES their requests to set aside the settlement agreement and for attorneys' fees (Dkt. # 98).

Dated this 12th day of February, 2025.

JAMES L. ROBART
United States District Judge

ORDER - 19